# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

JENNIFER FROST, an individual; and
JANE DOE, an individual,

Plaintiffs,

v.

THE CITY OF SIOUX CITY, IOWA;
ROBERT PADMORE, in his official capacity; and
CINDY RARRAT, in her official capacity,

Defendants.

Case No. 16-cv-4107

## COMPLAINT

Plaintiffs Jennifer Frost and Jane Doe[1] for their Complaint against the Defendants, state and allege as follows:

### INTRODUCTION

1. This is a civil rights action for declaratory and injunctive relief arising under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 2201, and the laws of the State of Iowa. This action stems from Defendants' violations of Plaintiffs' rights under the Fifth and Fourteenth Amendment to the United States Constitution.

2. In 2009, the City of Sioux City adopted Ordinance 51 (the "Pit Bull Ban" or the "Ordinance"). The Pit Bull Ban, now codified at Sioux City Municipal Code § 7.10 and titled "Pit Bulls Prohibited," prohibits owning or harboring "any dog that is an American Pit Bull Terrier, American Staffordshire Terrier, Staffordshire Bull Terrier, or any dog which has the

---

[1] Plaintiff Jane Doe brings this action using a pseudonym for herself and her dog, "Daisy," based on the need for anonymity in the lawsuit. Doe has a substantial privacy right and must remain anonymous, as she is challenging governmental activity and would be forced to admit her intention to engage in potentially illegal conduct, thereby subjecting her to potential loss of her dog, civil sanctions, and even criminal penalties. Doe will bring a Motion for Leave to Proceed Under Pseudonym for the Court to permit her to proceed in the litigation anonymously.

1

appearance and characteristics of being predominately of the breeds of Staffordshire Terrier [sic], American Pit Bull Terrier or American Staffordshire Terrier as set forth in the standards established by the American Kennel Club or United Kennel Club for any of the aforementioned breeds." SIOUX CITY, IOWA, CODE § 7.10.010.

3. Upon information and belief, Sioux City adopted the Pit Bull Ban in an effort to remove dangerous dogs from the city limits of Sioux City and/or reduce the number of dog bites within the city limits of Sioux City.

4. The Ordinance became effective in 2009, and at all relevant times, it has been the pattern, practice and custom of the City of Sioux City and its officers, agents, and employees to enforce the Ordinance as written since its inception.

5. The Ordinance authorizes the City to impound and "destroy" any dog it deems a pit bull, and provides that any person who violates the Pit Bull Ban may be subject to a criminal citation with up to 30 days imprisonment and/or a fine of up to $500, or a municipal infraction subject to a fine of up to $750 for a first offense. *See* SIOUX CITY, IOWA, CODE §§ 7.10.050; 7.01.020; 1.01.100(1)-(3).

6. Defendants have enforced the Ordinance against Plaintiff Frost's dog Jake, may imminently enforce the Ordinance against Plaintiff Frost's dog Reba, and may imminently enforce the Ordinance against Plaintiff Doe's dog "Daisy." As a result of the enforcement, potential enforcement, and reasonable fear of enforcement, Plaintiff Frost was required to relocate Jake outside of Sioux City's city limits, and is concerned that Reba may similarly be subject to impoundment under the Ordinance. Plaintiff Doe, upon learning of the enforcement action against Jake, is similarly concerned that the Defendants may seek to enforce the Ordinance against Daisy due to the similar physical appearance between Jake and Daisy. The

Ordinance has thereby deprived Plaintiffs of the comfort, companionship, and sense of security that their dogs provide them and their families.

## JURISDICTION AND VENUE

7. This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities secured by the Constitution of the United States and other federal statutes. This Court has federal question jurisdiction over this controversy under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000cc *et seq*. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8. Venue is proper in the Northern District of Iowa under 28 U.S.C. § 1391. The Defendants are residents of the Western Division of this Judicial District and a substantial part of the events or omissions giving rise to the claim occurred in the Western Division of this Judicial District.

## PARTIES

9. Plaintiff Jennifer Frost is an individual who has resided in Sioux City, Iowa since approximately October of 2015. Jennifer and her husband, Robert, are the parents of four children, aged seven (7) years, five (5) years, three (3) years, and eleven (11) months.

10. Jennifer obtained Jake, an approximately 10 year old purebred Staffordshire Bull Terrier, in November of 2006.

11. Jennifer obtained Reba, an approximately 2 year old mixed-breed dog in November of 2014.

12. Neither Jake nor Reba have ever bitten or harmed any person, threated harm toward any person, acted aggressively toward any person, or received any nuisance or other complaints.

13. Plaintiff Jane Doe, along with her husband John Doe and their eighteen (18) month old daughter, moved to Sioux City, Iowa in approximately June of 2015. The Does have resided within the Sioux City city limits since their arrival.

14. Jane Doe obtained Daisy, an approximately nine (9) month old mixed-breed dog in February of 2016. At the time Jane Doe obtained Daisy, the sellers identified Daisy as a mixed-breed dog and referred to Daisy as a "Colorado Bulldog."

15. Daisy has never bitten or harmed any person, threated harm toward any person, acted aggressively toward any person, or received any nuisance or other complaints.

16. Defendant City of Sioux City, Iowa ("Sioux City" or the "City") is a municipality for purposes of liability under 42 U.S.C. § 1983, and is located within the geographic area comprising the Northern District of Iowa.

17. Defendant Robert Padmore is the City Manager of Sioux City, Iowa. Among other official capacity duties, Defendant Padmore is responsible for enforcing Sioux City's Pit Bull Ban by entertaining a dog owner's written request for a hearing, acting as the hearing officer, and rendering the final and conclusive written decision of the hearing determination. SIOUX CITY, IOWA, CODE § 7.10.050(2). Upon information and belief, Defendant Padmore has exercised his authority to enforce the Pit Bull Ban by, among other things, adopting a policy and practice of enforcing the Pit Bull Ban and directing City officers under his supervision and control to force Plaintiff Frost to remove Jake from city limits.

18. Defendant Cindy Rarrat is the Poundmaster for the City of Sioux City, Iowa. Defendant Rarrat is authorized in her official capacity to enforce Sioux City's animal control ordinances, including the Pit Bull Ban. *See* SIOUX CITY, IOWA, CODE § 7.01.010. Defendant Rarrat also is authorized to direct the impoundment of dogs believed to be "pit bulls" and to

"destroy" any dog believed to be a "pit bull." *See* SIOUX CITY, IOWA, CODE § 7.10.050(1). Defendant Rarrat has exercised her authority to enforce the Pit Bull Ban by, among other things impounding Jake and forcing the Frosts to relocate Jake outside of Sioux City.

19. Defendants Padmore and Rarrat are sued in their official capacities. (Defendants Padmore and Rarrat and those City employees under their direction and control are hereinafter referred to as "Animal Control").

## FACTUAL ALLEGATIONS

20. In the spring of 2016, Animal Control picked up Jake approximately two blocks from the Frost residence.

21. Upon checking the information contained in a microchip implanted underneath Jake's skin, Animal Control learned that Jake was a Staffordshire Bull Terrier.

22. Animal Control informed Plaintiff Frost that Staffordshire Bull Terriers were one of the breeds banned by Sioux City's Pit Bull Ban and that Jake would not be allowed to continue to permanently live within the city limits of Sioux City.

23. Under the Ordinance, if Plaintiff Frost continued to house Jake within the city limits of Sioux City, Jake would be subject to impoundment and being euthanized.

24. Because Plaintiff Frost was unable to find a suitable home for Jake closer to Sioux City, Plaintiff Frost relocated Jake with family members living in New York.

25. As a result of the enforcement action taken by the Defendants against Jake, Plaintiff Frost has a reasonable concern that similar action could be taken against her mixed breed dog, Reba.

26. Plaintiff Doe was familiar with Plaintiff Frost's dog Jake.

5

27. Plaintiff Doe's mixed breed dog "Daisy" looks similar to Plaintiff Frost's dog Jake.

28. Although no enforcement action has as of yet been initiated against Plaintiff Doe's dog "Daisy" under the Pit Bull Ban, Plaintiff Doe possess a reasonable fear that "Daisy" could be subject to the Pit Bull Ban and Plaintiff Doe could be forced to relocate Daisy out of the Sioux City city limits or face the impoundment and potential euthanasia of Daisy due to the physical similarity between Jake and Daisy.

**UNRELIABILITY OF VISUAL BREED IDENTIFICATION OF MIXED BREED DOGS**

29. Over the past decade, the understanding of the canine genome has increased greatly. Through scientific study, it is now possible to determine breed composition of dogs through DNA analysis.

30. Study of the canine genome has also resulted in the development of gene markers which identify those genes related to physical appearance. There are approximately 20,000 protein coding genes in the canine genome. Of these, fewer than 1% control the external morphological features associated with the physical appearance attributed to specific breeds of dogs (e.g., ear shape and size, length of legs, length of coat, coat color, color pattern, shape of head, body size and type, and length of muzzle).

31. Due to the manner in which genes combine when dogs of different breeds are mated, mixed breed dogs commonly express physical traits and characteristics that are unrelated to their actual primary breed composition as determined by DNA testing.

32. Due to those same genetic combination factors referenced above, mixed breed dogs often do not express the physical traits and characteristics that are commonly associated

with the breeds that do make up their actual primary breed composition as determined by DNA testing.

33. As a result, scientific studies have determined that even people with training in identifying dog breeds are wrong more often than not in determining the primary breed of a mixed breed dog based on visual analysis when compared to the animal's actual primary breed composition as determined by DNA testing.

**UNRELIABILITY OF BREED AS A PREDICTOR OF DANGEROUSNESS**

34. Although media and news outlets commonly report that certain breeds of dogs are thought to be a greater risk to bite humans than other breeds of dogs, there is no scientific or epidemiological basis for these statements.

35. Most non-scientific claims that assert certain breeds pose a greater risk of dangerousness to humans rely on a sixteen year old study conducted by individual investigators from the Centers for Disease Control and Prevention ("CDC'), the Humane Society of the United States ("HSUS"), and the American Veterinary Medical Association ("AVMA") (*See,* Sacks, Jeffrey J., Leslie Sinclair, Julie Gilchrist, Gail C. Golab, and Randall Lockwood. "Breeds of Dogs Involved in Fatal Human Attacks in the United States between 1979 and 1998." *Journal of the American Veterinary Medical Association* 217.6 (2000): 836-40) (available at: https://www.avma.org/Advocacy/StateAndLocal/Documents/javma_000915_fatalattacks.pdf) ("AVMA Article").

36. In response to the non-scientific claims that the AVMA Article concluded that certain breeds of dogs were more dangerous than other breeds of dogs, the AVMA issued the following statement:

> In contrast to what has been reported in the news media, the data contained within this report **CANNOT be used to infer any breed-specific risk** for dog bite

7

OMA-419483-2

Case 5:16-cv-04107-LRR   Document 2   Filed 08/05/16   Page 7 of 13

fatalities (e.g., neither pit bull-type dogs nor Rottweilers can be said to be more "dangerous" than any other breed based on the contents of this report). To obtain such risk information it would be necessary to know the numbers of each breed currently residing in the United States. Such information is not available.

Data in this report indicate that the number of dogs of a given breed associated with fatal human attacks varies over time, further suggesting that such data should not be used to support the inherent "dangerousness" of any particular breed. More than 25 breeds have been involved in fatal human attacks over the 20-year period summarized in this report.

(emphasis in original)

37. The AVMA further stated, "Statistics on fatalities and injuries caused by dogs cannot be responsibly used to document the 'dangerousness' of a particular breed, relative to other breeds, for several reasons."

38. The CDC responded to the non-scientific use of the AVMA Article by warning that the study "does not identify specific breeds that are most likely to bite or kill, and thus is not appropriate for policy-making decisions related to the topic."

39. HSUS responded to the use of the AVMA Article to support breed specific bans with a statement that "There is no evidence that breed-specific laws reduce dog bites or attacks on people, and they divert resources from more effective animal control and public safety initiatives. . . . Breed-based policies aren't founded on science or credible data, but on myths and misinformation surrounding different breeds."

## OPERATION OF THE SIOUX CITY PIT BULL BAN

40. For mixed breed dogs, the Sioux City Pit Bull Ban relies on visual identification to determine whether an animal possesses "the appearance and characteristics of being predominately of the breeds of Staffordshire Terrier [sic], American Pit Bull Terrier or American Staffordshire Terrier as set forth in the standards established by the American Kennel Club or United Kennel Club" for these breeds.

41. Due to the Pit Bull Ban's reliance on visual breed identification for mixed breed dogs, more often than not:

   a. Mixed breed dogs will be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though none of these breeds will, in fact, be the predominate breed of the animal; and

   b. Mixed breed dogs will not be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though one or more of these breeds will, in fact, be the predominate breed of the animal.

42. Approximately one-half of the 80 million dogs in the United States are mixed breed dogs.

43. Upon information and belief, one-half of the dogs in Sioux City are mixed breed dogs.

44. Statistically, for the mixed breed dog population of Sioux City, the Pit Bull Ban will misclassify more than one-half of all mixed breed dogs and ban dogs that should not be banned under the Ordinance and fail to ban dogs that the Ordinance requires be banned.

**CLAIM FOR RELIEF**
**Violation of the United States Constitution**
**(42 U.S.C. § 1983)**

45. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 44 as if realleged in this paragraph.

46. The Pit Bull Ban fails to provide fair warning of exactly what actions and what animals are prohibited by the Ordinance:

   a. The Ordinance's identification of the animals subject to the ban, are overly vague and lack sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or to provide persons of ordinary

intelligence a reasonable opportunity to know what specific animals are prohibited by the Ordinance;

b. The definitions of the animals banned by the Ordinance allow for and have resulted in its arbitrary, inconsistent, and discriminatory enforcement by Defendants.

47. Defendants have enforced and continue to enforce the Ordinance in arbitrary, inconsistent, and discriminatory manner.

48. The Ordinance is overinclusive as a safety regulation because it bans animals that do not pose a risk of harm to others.

49. The Ordinance is underinclusive as a safety regulation because it fails to ban animals that do pose a risk of harm to others.

50. By deeming all predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs as dangerous, the Ordinance bears no rational relationship to any legitimate state interest in health, safety or welfare.

51. The Ordinance's disparate classification and treatment of owners of predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs from owners of all other breeds of dogs bears no rational relationship to any legitimate state interest.

52. Under Iowa law, Plaintiffs have a protectable property interest in their dogs and in their money.

53. The Ordinance authorizes Defendants to immediately impound any dog they suspect to be prohibited under the Ordinance. *See* SIOUX CITY, IOWA, CODE § 7.10.050.

54. The Ordnance imposes a short 7-day time limit on owners who wish to request a breed-determination hearing. The time limit begins to run on the day of impoundment. *See* SIOUX CITY, IOWA, CODE § 7.10.050(2).

55. The breed-determination hearing does not provide dog owners a meaningful opportunity to respond to allegations against them.

56. The Ordinance assigns dog owners the burden to prove that their dog is not a prohibited breed. *See* SIOUX CITY, IOWA, CODE § 7.10.050(2).

57. The Ordinance does not specify the quantum of evidence that a dog owner must satisfy to prevail at a breed-determination hearing. *See* SIOUX CITY, IOWA, CODE § 7.10.050(2).

58. The Ordinance further provides, "The City Manager or the City Managers designee will act as hearing officer. At the conclusion of the hearing or some time thereafter the hearing officer shall render a written decision. The findings of the City Manager or the City Managers designee shall be conclusive." SIOUX CITY, IOWA, CODE § 7.10.050(2).

59. The Ordinance does not provide for further appeal or review. *See* SIOUX CITY, IOWA, CODE § 7.10.

60. The Ordinance imposes no time limit on how soon a breed-determination hearing must be held. Meanwhile, the impoundment fees continue to accrue at the owner's expense. *See* SIOUX CITY, IOWA, CODE § 7.03.040.

61. The Ordinance provides no mechanism for an owner to receive an official breed determination before the dog is seized. Only after the City impounds a dog and the owner incurs impoundment fees, can the owner contest the City's breed determination.

62. The Ordinance does not contain any provision requiring City to return impoundment fees to a prevailing owner whose dog was wrongfully impounded.

63. The threat of indefinite impoundment and associated fees dissuade affected dog owners from exercising their due process rights.

64. All of the above actions and omissions are the official policies, practices and customs of the Defendants.

65. The official policies, practices and customs of the Defendants as described above violate the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully requests that this Court:

1. Enter judgment declaring that the Ordinance and related policies, practices, and customs of the Defendants violates the Fifth and Fourteenth Amendments to the United States Constitution and may not lawfully be enforced in the future;

2. Issue preliminary and permanent injunctions prohibiting the Defendants, their employees and agents, and all persons acting under their direction from enforcing the above referenced Ordinance, policies, practices, and customs;

3. Grant Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and

4. Grant all such other and further relief as this Court deems just and proper.

Dated this 5th day of August, 2016.

    BY: /s/ Mark D. Hill
Mark D.Hill - # AT0010591/27432
Gene Summerlin - (*pro hac vice pending*)
Marnie Jensen - (*pro hac vice pending*)
Kamron Hasan (*pro hac vice pending*)
HUSCH BLACKWELL, LLP
13330 California St., Suite 200
(402) 964-5000
(402) 964-5050 (fax)
gene.summerlin@huschblackwell.com
marnie.jensen@huschblackwell.com
mark.hill@huschblackwell.com
kamron.hasan@huschblackwell.com